UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PRESTON LEWIS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 22-4007** |
| **JONATHAN FRIEDMAN et al.** | **SECTION: "G"(5)** |

## ORDER AND REASONS

This litigation arises from law enforcement's alleged arrest of *pro se* Plaintiff Preston Lewis ("Plaintiff") and the seizure of $11,020 in cash on Plaintiff's person (the "Cash").[1] Plaintiff brings claims against Defendants Jonathan Friedman ("Friedman"), Raymond Del Valle ("Del Valle"), Troy Pichon ("Pichon"), Steve Lynn ("Lynn"), Trent Cuccia ("Cuccia"), Jacob Weixler ("Weixler"), K-9 Boyka, National Railroad Passenger Corporation, Amtrak ("Amtrak"),[2] Amtrak Police Department,[3] Office of National Drug Control Policy, Blaise D'Antoni ("D'Antoni"), Randy Hoth ("Hoth"), Clerk of Court, Orleans Parish ("Clerk of Court"), Melvin Zeno ("Zeno"), Alexandra Giavotella ("Giavotella") and Cuong Vu ("Vu") (collectively, "Defendants").[4] Before the Court is Weixler's "Motion to Stay Claims Pending Arbitration."[5] Friedman and Plaintiff filed

---

[1] *See* Rec. Doc. 39.

[2] Plaintiff incorrectly refers to National Railroad Passenger Corporation, Amtrak as "Amtrack National Railroad Passanger Corporation" in the Complaint. *Id*. at 1.

[3] Plaintiff incorrectly refers to Amtrak Police Department as "Amtrack Police Department." *Id*.

[4] *Id.*

[5] Rec. Doc. 28.

1

oppositions to the motion.[6] Weixler replies in further support of the motion.[7] Considering the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court grants the motions and stays the proceedings against Weixler pending arbitration.

## I. Background

### A.  Factual Background

In the Complaint, Plaintiff alleges that, on October 2, 2019, while boarding an Amtrak train in New Orleans, Louisiana, he was approached by Del Valle and Pichon, who told him they were looking for an individual named Brandon Lewis.[8] After Plaintiff told them "I'm not Brandon" and presented his identification card, Plaintiff alleges he was detained and taken to a room where he "was searched against his will."[9] Specifically, Plaintiff alleges that Del Valle and Pichon waited for Lynn to arrive with his K-9, at which time the officers "spread [Plaintiff's] bags over the room" and allowed the dog to do an "open air sniff."[10] Plaintiff contends that he was wearing a heart monitor, sat for a long period of time, complained of chest pains, "and was told to shut up" as the officers searched his bags.[11] Plaintiff alleges that the officers found the Cash in one of his bags and proceeded to confiscate the Cash and his Amtrak ticket even though Plaintiff asserted his Fifth Amendment rights and told them he had a receipt for the Cash.[12]

Plaintiff further alleges that, after he was released, he "was presented a notice of pending

---

[6] Rec. Docs. 31, 38.

[7] Rec. Doc. 37.

[8] Rec. Doc. 39 at 6.

[9] *Id.*

[10] *Id.* at 6–7.

[11] *Id.* at 7.

[12] *Id.*

2

forfeiture" and he filed "a claim with the Orleans Parish District Court" to get his property back.[13] After learning that the courthouse was closed in early 2020 due to COVID-19, Plaintiff avers that he called the District Attorney's Office and spoke with D'Antoni, "an attorney of the said property forfeiture."[14] Plaintiff asserts that D'Antoni told Plaintiff "the case was over and that the court sent certified mail to the address [Plaintiff] had on file and that [Plaintiff] lost [his] property for failure to respond."[15] Plaintiff further asserts that the proceeding "was held in a criminal court where [he] was told it was a civil forfeiture" and that, despite his efforts, he never received a response from D'Antoni after their conversation.[16]

Plaintiff alleges that he hired Weixler as his attorney in February 2021 and filed a "motion for default."[17] Plaintiff avers that Weixler told him "that he found the court papers [Plaintiff] filed with the court on November 1, 2019, in a hidden folder where no one could find it."[18] Plaintiff alleges that, "[i]n those papers was a search and seizure warrant for the property of [Plaintiff] signed by Friedman on October 4, 2019, days after the initial confiscation of [the Cash]."[19] Plaintiff contends that Weixler told him that Hoth, "a new assistant district attorney," would be taking over the case and that he "should get his property back."[20] Plaintiff alleges that he "heard that promise for the remainder of the 2021 year" and that "the court would have a hearing on the

---

[13] *Id*. at 10.

[14] *Id*. at 11.

[15] *Id*.

[16] *Id*.

[17] *Id*.

[18] *Id*. at 12.

[19] *Id*.

[20] *Id*.

motion soon."[21] Plaintiff avers that, having had "little to no contact with [] Weixler," he determined through his own research that he had an upcoming court date on the matter on September 21, 2022, despite never receiving any notice from the court or Weixler.[22] Plaintiff avers that, at the hearing, he obtained a judgment ordering his property returned.[23] However, Plaintiff alleges that the judge presiding over the hearing told him that "since [] Weixler had not recused himself of the case that he would have to write the ex parte motion for the return of the property of Plaintiff."[24]

Plaintiff contends that "he took the court order to every evidence location in New Orleans" but "was told they have no such property" and he "has not had any of his property returned to him."[25] Thus, Plaintiff brings claims against Defendants for negligence and under 42 U.S.C. § 1983 for deprivation of his civil rights in violation of the Fourth, Fifth, Sixth, Seventh, Eighth, and Fourteenth Amendments (collectively, the "Section 1983 Claims") and under Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act Claim").[26] Plaintiff also seeks $50 million in damages.[27]

---

[21] *Id*. at 12.

[22] *Id*. at 13.

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *See id.* at 14, 15

[27] *Id*. at 16.

B.      *Procedural Background/Federal Court Proceedings*

On October 18, 2022, Plaintiff filed a Complaint in this Court.[28] On January 13, 2023, the Magistrate Judge granted Plaintiff's motion for leave to file an amended complaint.[29] Plaintiff filed the Amended Complaint on February 20, 2023.[30]

Meanwhile, Weixler filed the instant motion on January 23, 2023.[31] The motion was set for submission on February 8, 2023.[32] Pursuant to Local Rule 7.5, any opposition to a motion must be filed eight days before the noticed submission date.[33] Thus, any opposition to Weixler's motion was due on January 31, 2023. On January 31, 2023, Friedman filed a timely opposition to the motion.[34] Plaintiff filed an untimely opposition to the motion on February 13, 2023.[35] Nevertheless, considering Plaintiff's *pro se* status, the Court exercises its discretion to consider Plaintiff's untimely opposition. On February 14, 2023, with leave of Court, Weixler filed a reply in further support of the motion.[36]

---

[28] Rec. Doc. 1.

[29] Rec. Doc. 25; *see also* Rec. Doc. 10.

[30] Rec. Doc. 39.

[31] Rec. Doc. 28.

[32] Rec. Doc. 28-2.

[33] EDLA Local Rule 7.5.

[34] Rec. Doc. 31.

[35] Rec. Doc. 38.

[36] Rec. Doc. 37.

## II. Parties' Arguments

### A.   *Weixler's Arguments in Support of the Motion*

In support of the motion to stay, Weixler argues that he was hired by Plaintiff in 2021 for representation "in the civil asset forfeiture proceedings in Orleans Criminal District Court related to [the Cash]."[37] Weixler alleges that, "[a]t the outset of the engagement, [Plaintiff] signed a written engagement letter" that contains an arbitration agreement (the "Arbitration Agreement") covering "[a]ny dispute, controversy or claim that may arise" between Weixler and Plaintiff and expressly applies the arbitration rules of the American Arbitration Association (the "AAA").[38] Weixler avers that the Arbitration Agreement "is enforceable and mandatory" pursuant to the Federal Arbitration Act., 9 U.S.C. § 1, *et seq*. (the "FAA") such that this matter should be stayed pending arbitration.[39]

Weixler asserts two arguments in support of this conclusion. First, Weixler argues that Plaintiff's claims against him are subject to mandatory arbitration under the FAA and Louisiana law.[40] Weixler asserts that, under the FAA, there is a strong presumption in favor of arbitration that can only be overcome if the arbitration clause at issue "is not susceptible of an interpretation that could cover the dispute."[41] Weixler further asserts that the Louisiana Supreme Court has held that an arbitration clause between an attorney and client is valid and enforceable "provided the clause does not limit the attorney's substantive liability, provides for a neutral decision maker,

---

[37] Rec. Doc. 28-1 at 1.

[38] *Id*. at 1, 4 (quoting Rec. Doc. 28-3 at 5).

[39] *Id*. at 1.

[40] *See id*. at 4.

[41] *Id*. at 4–5 (quoting *Downer v. Siegel*, 489 F.3d 623, 626 (5th Cir. 2007)).

6

and is otherwise fair and reasonable to the client."[42] Weixler avers that the Arbitration Agreement satisfies all of the requirements laid out by the Supreme Court because it gives Plaintiff the opportunity to opt out, sufficient time to do so, and informs Plaintiff "of the consequences of agreeing to binding arbitration and the rights that he waives in doing so."[43] Finally, Weixler avers that, "[w]hile it is not exactly clear what claims [Plaintiff] is attempting to allege against [him], it *is* clear that any such claims 'involve the firm's legal services' and are thus subject to the [A]rbitration [A]greement."[44]

Second, Weixler argues that questions regarding the arbitrability of Plaintiff's claims must be submitted to the arbitrator rather than determined by this Court.[45] Weixler asserts that, under the rules of the AAA, "the arbitrator 'shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'"[46] Weixler contends that the United States Supreme Court and Fifth Circuit embrace and enforce this rule.[47] Therefore, Weixler concludes that, since the Arbitration Agreement expressly states that it shall apply the AAA's rules, "any question as to whether [Plaintiff]'s claims against [] Weixler in this case are arbitrable must themselves be resolved by an arbitration."[48]

---

[42] *Id*. at 5 (quoting *Hodges v. Reasonover*, 103 So. 3d 1068, 1076 (La. 2012)).

[43] *Id*. at 5–6.

[44] *Id*. at 7 (citing Rec. Doc. 28-3 at 5).

[45] *See id*.

[46] *Id*. at 7–8 (citing Comm. Arb. R., Amer. Arb. Assoc., R-7(a)).

[47] *Id*. at 8 (first citing *Henry Schein Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019); and then citing *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2017)).

[48] *Id*.

### B. Friedman's Arguments in Opposition to the Motion

In opposition, Friedman argues that he opposes the motion "to the extent that Weixler or any other party seeks to impose a stay as to the entirety of the litigation."[49] Friedman asserts that he is a non-signatory to the Arbitration Agreement and "the claims against Weixler and the claims against [Friedman] do not involve the same operative facts."[50] Finally, Friedman asserts that "any potential arbitration between [Plaintiff] and Weixler would not be impacted by the claims against [] Friedman."[51] Therefore, Friedman requests that any stay be imposed solely in regards to Plaintiff's claims against Weixler.[52]

### C. Weixler's Reply Memorandum to Friedman's Opposition

In reply to Friedman's opposition, Weixler clarifies that that he only seeks to stay all claims Plaintiff has made against, him, not claims made against other Defendants.[53] Weixler asserts that he "*does not seek* to have the Court stay the entire case or to stay any claims asserted against any other parties."[54]

### D. Plaintiff's Arguments in Opposition to the Motion

In opposition to Weixler's motion, Plaintiff argues that Weixler "engaged in illegal activities with the court of Orleans Parish" and "[c]riminal offenses are not resolved by

---

[49] Rec. Doc. 31 at 1.

[50] *Id*. at 2. Friedman argues that Plaintiff brings legal malpractice claims against Weixler arising out of a relationship forming in February 2021, whereas Plaintiff brings claims against Friedman for allegedly signing a warrant in October 2019. *Id*.

[51] *Id*. at 3.

[52] *Id*.

[53] Rec. Doc. 37 at 1.

[54] *Id*.

8

arbitration."[55] Plaintiff asserts that he does not have substantial income, does "not hav[e] enough money to afford such arbitration," and Weixler told Plaintiff that "he needed to follow his rules, or he would leave the case."[56] Plaintiff further asserts that he is "already aggrieved and confused by this whole court process where no one was abiding by the court" and he would not have "a fair shake [in] arbitration."[57] Finally, Plaintiff avers the AAA "does not trump any civil rights laws being violated on a federal level," that the Arbitration Agreement is only valid where both parties intend to arbitrate, and thus an arbitrator does not have jurisdiction.[58]

### IV. Legal Standard

The Federal Arbitration Act was enacted in order to "allow[] a party to . . . an arbitration agreement to petition any United States district court for an order directing that such arbitration proceed in the manner provided for in such agreement."[59] In *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, the Fifth Circuit explained that the FAA was "in large part motivated by the goal of eliminating the courts' historic hostility to arbitration agreements."[60] The Fifth Circuit further explained that "Section 2 of the FAA puts arbitration agreements on the same footing as other contracts."[61] This means that, "as a matter of federal law, arbitration agreements and clauses

---

[55] Rec. Doc. 38 at 1.

[56] *Id*. at 2.

[57] *Id*.

[58] *Id*. at 3–5.

[59] *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989) (internal quotation marks omitted).

[60] 379 F.3d 159, 166 (5th Cir. 2004).

[61] *Id.*

9

are to be enforced unless they are invalid under principles of state law that govern all contracts."[62]

Under the FAA, there is a "strong federal policy in favor of enforcing arbitration agreements."[63] Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . .[64]

"[I]f the issues in a case are within the reach of that [arbitration] agreement, the district court has no discretion under section 3 to deny the stay."[65] Generally, federal courts apply the FAA only to parties to an arbitration agreement absent a non-party asking for a stay of the entire litigation.[66]

## V. Analysis

### A.  *Whether the Federal Arbitration Act Applies to this Dispute*

In resolving the instant motion before the Court, it is first necessary to determine whether the FAA governs the dispute between Plaintiff and Weixler. Section 2 of the FAA states that a "contract evidencing a transaction involving *commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable."[67] "Commerce" under Section 1 of the FAA means "commerce among the several

---

[62] *Id.*

[63] *Texaco Expl. & Prod. Co. v. AmClyde Engineered Prod. Co.*, 243 F.3d 906, 909 (5th Cir. 2001) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985)).

[64] 9 U.S.C. § 3.

[65] *Texaco Expl. & Prod. Co.*, 243 F.3d at 909 (citing *Hornbeck Offshore Corp. v. Coastal Carriers Corp.*, 981 F.2d 752, 754 (5th Cir. 1993)); *Waste Mgmt., Inc. v. Residuous Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 342 (5th Cir. 2004).

[66] *Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001); *see also Matter of Talbott Big Foot, Inc.*, 887 F.2d 611, 614 (5th Cir. 1989).

[67] 9 U.S.C. § 2 (emphasis added).

States or with foreign nations."[68] The U.S. Supreme Court has held that the FAA "provide[s] for the enforcement of arbitration agreements within the full reach of the Commerce Clause" in the United States Constitution.[69]

Here, Plaintiff does not contest that his engagement letter with Weixler involves interstate commercial activity.[70] In any event, this case involves a dispute between Plaintiff, a Florida resident,[71] and Weixler, a Louisiana attorney personally served in Louisiana.[72] Plaintiff received services from Weixler in Louisiana after agreeing to a letter of engagement sent to him via e-mail while he resided in Florida.[73] In other words, Plaintiff and Weixler "engaged in the performance of a contract as citizens of different states."[74] Therefore, the Court finds that the Arbitration Agreement falls within the scope of the FAA.[75] The Court will now consider whether the Arbitration Agreement is enforceable.

---

[68] *Id.* § 1.

[69] *Perry v. Thomas*, 482 U.S. 483, 490 (1987).

[70] Rec. Doc 38; Rec. Doc. 39.

[71] *See* Rec. Doc. 1-1 at 1 (Plaintiff states in the Civil Cover Sheet that he is a resident of Escambia County, Florida.); *see also* Rec. Doc. 39 at 6 (Plaintiff states in the Amended Complaint that he is a resident of Pensacola, Florida).

[72] *See* Rec. Doc. 24; *see also* Rec. Doc. 28-4 at 5.

[73] Rec. Doc. 28-3 at 1.

[74] *See TWTB, Inc. v. Rampick*, No. 15-3399, 2016 WL 9449763, at *6 (E.D. La. October 25, 2016) (Brown, J.).

[75] *Id.*

B.     *Enforceability of the Arbitration Agreement*

To determine if an arbitration clause is enforceable, the Fifth Circuit has established a two-step inquiry.[76] First, a court determines whether the parties agreed to arbitrate.[77] This first step itself is subdivided into two considerations: (a) whether there was a valid agreement to arbitrate and (b) whether the dispute in question falls within the scope of the arbitration clause.[78] If both questions are answered in the affirmative, the court moves on to the second step. Under the second step, a court determines whether "any federal statute or policy renders the claims nonarbitrable."[79]

1.     **Whether The Arbitration Agreement is Valid**

"The first question, whether an agreement exists, is a question for the court, to be answered by applying 'ordinary contract principles.'"[80] Courts should generally apply "'ordinary state-law principles that govern the formation of contracts' when deciding whether an agreement to arbitrate exists."[81] Under Louisiana law, "[i]n the context of attorney-client arbitration clauses . . . [a] lawyer has an obligation to fully explain to the client the possible consequences of entering into an arbitration clause, including the legal rights the client gives up by agreeing to binding arbitration."[82] In the absence of a "clear and explicit disclosure of the consequences of a binding

---

[76] *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002).

[77] *Id.*

[78] *Id.*

[79] *Jones v. Halliburton Co.*, 583 F.3d 228, 234 (5th Cir. 2009).

[80] *Gallagher v. Vokey*, 860 Fed. Appx. 354, 356 (5th Cir. 2021).

[81] *Id.* (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

[82] *Hodges v. Reasonover*, 2012-0043 (La. 2012); 103 So. 3d 1069, 1077.

arbitration clause, the client's consent is not truly 'informed.'"[83] "At a minimum, the attorney must disclose the following legal effects of binding arbitration, assuming they are applicable:

- Waiver of the right to a jury trial;
- Waiver of the right to an appeal;
- Waiver of the right to broad discovery under the Louisiana Code of Civil Procedure and/or Federal Rules of Civil Procedure;
- Arbitration may involve substantial upfront costs compared to litigation;
- Explicit disclosure of the nature of claims covered by the arbitration clause, such as fee disputes or malpractice claims;
- The arbitration clause does not impinge upon the client's right to make a disciplinary complaint to the appropriate authorities;
- The client has the opportunity to speak with independent counsel before signing the contract.[84]

Accordingly, "a binding arbitration clause between an attorney and client does not violate [Louisiana's] Rule of Professional Conduct 1.8(h) provided the clause does not limit the attorney's substantive liability, provides for a neutral decision maker, and is otherwise fair and reasonable to the client."[85]

In *Hodges v. Reasonover*, the Louisiana Supreme Court found insufficient an arbitration agreement contained in an engagement letter between attorney and client because it failed to include a "full and complete disclosure of the potential effects of an arbitration clause," as well as "the types of disputes covered by the arbitration clause. . . ."[86] The court determined that the only claims contemplated by the arbitration agreement were those involving fee disputes, and made no reference to its applicability to any other possible claims by the plaintiff.[87] Nevertheless,

---

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *Id.* at 1078.

[87] *Id.*

the court recognized the validity of arbitration agreements in attorney-client engagement agreements provided they meet the above listed requirements.[88]

Unlike the parties in *Reasonover*, Plaintiff and Weixler agreed to a letter of engagement which contained a provision requiring arbitration of all lawyer-client disputes.[89] The Arbitration Agreement outlines that Plaintiff would waive the right to trial by a judge or jury, the right to an appeal, and the right to broad discovery under the Louisiana Code of Civil Procedure and the Federal Rules of Civil Procedure.[90] The Arbitration Agreement also makes clear that arbitration can involve substantial upfront costs.[91] Additionally, the provisions of the Arbitration Agreement expressly indicate the nature of the claims covered by the provision, and in no way indicates to Plaintiff that his right to make a disciplinary complaint to the appropriate authorities has been in any way limited.[92] Finally, the agreement encourages the client to seek the advice of independent legal counsel regarding the Arbitration Agreement, and even goes as far as to suspend the enforcement of the Arbitration Agreement for thirty days to provide the client with adequate time to do so.[93] Accordingly, the Arbitration Agreement satisfies the *Reasonover* requirements above such that it constitutes a valid agreement between Plaintiff and Weixler.

---

[88] *Id.*

[89] Rec. Doc. 38-1 at 4.

[90] *Id.* at 4–5.

[91] *Id.* at 5.

[92] *Id.* at 4-5.

[93] *Id.* at 5.

.     **2.**     **Whether Plaintiff's Claims Are Within the Arbitration Agreement's Scope**

The Court must also analyze whether Plaintiff's claims are within the scope of the Arbitration Agreement. The question of "'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter."[94] A court "will not assume that the parties agreed to arbitrate arbitrability '[u]nless the parties clearly and unmistakably provide otherwise.'"[95] Thus, a court must determine if the parties to the arbitration agreement "'clearly and unmistakably' provided for the arbitration panel to decide arbitrability."[96] Both the Supreme Court and the Fifth Circuit have previously held that the express adoption of the AAA's rules within an arbitration agreement "presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."[97]

> The Arbitration Agreement clearly adopts the AAA's Rule, stating:
>
> Any dispute, controversy, or claim that may arise between [Plaintiff] and the firm (or any individual attorney in the firm) shall be resolved by an arbitrator appointed by the parties applying the American Arbitration Association's Commercial Arbitration Rules, Expedited Procedures, effective at the time of the dispute.[98]

Accordingly, questions of arbitrability are properly reserved for the arbitrator and are not suitable for review by this Court.[99] Thus, Defendant's motion to stay litigation pending arbitration must be granted to allow the arbitrator to determine the arbitrability of Plaintiff's claims.

---

[94] *Petrofac, Inc. v. DynMcDermott Petro. Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (citing *First Options of Chi., Inc.*, 514 U.S. at 943.

[95] *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)).

[96] *Id.*

[97] *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019); *Petrofac, Inc.*, 687 F.3d at 675.

[98] Rec. Doc. 38-1 at 4.

[99] *See, e.g., First Options of Chicago, Inc.*, 514 U.S. 938.

### 3. Whether any Federal Statute or Policy Renders Plaintiff's Claims Non-Arbitrable

Under the second step of the Fifth Circuit's two-part test, the Court determines whether any federal statute or policy renders a party's claims non-arbitrable. Here, Plaintiff points to the "effective vindication exception" to argue against the arbitration of his claims.[100] The Supreme Court has recognized the "effective vindication" as allowing courts to "invalidate, on 'public policy' grounds, arbitration agreements that 'operat[e] . . . as a prospective waiver of a party's right to pursue statutory remedies."[101] However, the Arbitration Agreement does not waive Plaintiff's rights to pursue statutory remedies. Rather, it stipulates that parties shall arbitrate "all disputes relating to costs, fees, compensation, or renumeration to the firm," as well as "all other disputes involving the firm's legal services.:[102] The Court can find no case law to suggest that an agreement to arbitrate disputes regarding an attorney's representation of a client is a waiver of a statutory right. Accordingly, Plaintiff's claims are arbitrable. Thus, pursuant to Section 3 of the FAA, the Court must grant a stay of the proceedings regarding Plaintiff's claims against Weixler. However, because no non-signatory to the Arbitration Agreement has requested a stay of the entire proceeding, this stay applies only to Plaintiff's claims against Weixler.[103]

---

[100] Rec. Doc. 38.

[101] *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 235–36 (2013) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637, n.19 (1985)) (emphasis omitted).

[102] *Id.*

[103] *Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001); *see also Matter of Talbott Big Foot, Inc.*, 887 F.2d 611, 614 (5th Cir. 1989).

**V. Conclusion**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Weixler's "Motion to Stay Claims Pending Arbitration"[104] is **GRANTED**.

**IT IS FURTHER ORDERED** that all proceedings regarding Plaintiff's claims against Weixler are **STAYED** pending arbitration. Plaintiff's claims against the remaining Defendants shall proceed in this Court.

**NEW ORLEANS, LOUISIANA**, this  20th  day of April, 2023.

_____
**NANNETTE JOLIVETTE BROWN
CHIEF JUDGE
UNITED STATES DISTRICT COURT**

---

[104] Rec. Doc. 28.